**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **GREGORY WILLIAMS,** | **Civil Action No. 20-413 (SDW)** |
| **Petitioner,** | |
| **v.** | **OPINION** |
| **BRUCE DAVIS, et al.,** | |
| **Respondents.** | |

**WIGENTON**, District Judge:

Presently before the Court is the second amended petition for writ of habeas corpus under 28 U.S.C. § 2254 by Petitioner Gregory Williams, a New Jersey state prisoner, challenging his 2012 conviction for robbery and weapons charges. (ECF No. 13). Respondents filed an answer to the petition for writ of habeas corpus and a supplemental answer (ECF Nos. 9, 22), and Petitioner filed a reply brief to Respondents' first answer (ECF No. 10) and did not reply to the supplemental answer. For the following reasons, Petitioner's second amended habeas petition is denied, and Petitioner is denied a certificate of appealability.

**I. PROCEDURAL HISTORY**

In January 2020, Petitioner Gregory Williams filed a petition for writ of habeas corpus under 28 U.S.C. § 2254, and, shortly thereafter, filed an amended petition. (ECF No. 1, 3). Respondents filed an answer to the amended petition, and Petitioner filed a reply brief. (ECF Nos. 9, 10). On May 27, 2021, this Court dismissed Petitioner's amended habeas petition without prejudice because it contained unexhausted claims. (ECF Nos. 11-12). On July 2, 2021, Petitioner filed a second amended petition, which he suggested contained only exhausted claims. (ECF No. 13). However, he also filed a motion to stay this proceeding while he brought new claims in state

1

court.  (ECF No. 14).  Ultimately, Petitioner withdrew his motion to stay and requested to have his second amended petition ruled on as filed. (ECF No. 17).  This Court granted Petitioner's request to withdraw his motion to stay and directed Respondents to file a supplemental answer to the second amended petition.  (ECF No. 18).  Respondents filed a supplemental answer[1] on January 14, 2022, and Petitioner did not file a reply brief.  (ECF No. 22).

## II.  BACKGROUND

The Superior Court of New Jersey, Appellate Division denied Petitioner's direct appeal on June 4, 2015, summarizing the facts, in relevant part, as follows.

> In a seven-count indictment, defendant Gregory Williams was charged with first-degree robbery, N.J.S.A. 2C:15-1 (counts one and five); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (counts two and six); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (counts three and seven); and second-degree robbery, N.J.S.A. 2C:15-1 (count four).

> The indictment alleged that, over an eight-day period in August 2008, Williams committed a series of three robberies.

(ECF No. 9-6 at 1-2).  Petitioner was acquitted on counts one through three, and he pleaded guilty to count four.  (*Id.* at 2-3).  He now challenges his conviction on counts five, six and seven. Petitioner pleaded guilty to count four, second-degree robbery of a bicycle, and the Appellate Division made the following findings of fact concerning counts five, six and seven.[2]

> On August 19, 2008, defendant approached Johnson, used force to take his bicycle, and then rode away, intending to keep the bike.

> One week later, at approximately 10:00 p.m. on August 26, 2008, the Ruiz robbery occurred. The facts surrounding that incident, which form the basis of counts five through seven, are relatively

---

[1] In their supplemental answer to the second amended petition, Respondents addressed the issues of the timeliness and exhaustion.  They relied on their original answer to the amended petition (ECF No. 9) in opposition to the merits of Petitioner's habeas claims.  (ECF No. 22).

[2] The Appellate Division referred to victim Maurio Ruiz-Garrido as "Ruiz" to avoid confusion with references to his cousin Patty Garrido.  (ECF No. 9-6 at 1).

straightforward and are aptly summarized in Judge Daniel's findings at the <u>Wade</u> hearing:

> [] Ruiz was standing at the corner of Clinton Avenue and West Front Street in the City of Plainfield, New Jersey, waiting for a traffic light to change, when a person then unknown to him shouted something to him from behind. I think the word was "Yo." And [Ruiz] turned around and he was hit by this person on the side of his head.

> He testified that he was then grabbed by this person and the person demanded money, and the person also had a knife on him. He grabbed [] Ruiz by his shirt, by the collars, and at one point took out a silver knife and put it against his stomach, demanded money. A struggle ensued, and [] Ruiz testified that he was able to somehow get free of … defendant.

> The shirt that was being grabbed by [] defendant came off of [] Ruiz's body and he was able to get free of him and get away.

> He testified that at the time this occurred, . . . he was approximately one-and-a-half feet from [defendant] when they … had this struggle, this encounter, and that he was looking at [defendant's] face and he didn't have anything on, such as a hat or a hoodie or anything like that, that would cover any portion of his face. He said he could see his face clearly. He said he was not under the influence of any drugs or he had not been drinking at all that evening.

> He described the man later on … to the police as a tall black man with facial hair, a bit taller than him, [] Ruiz, and he also noticed that he had a bald head.[]

> Ruiz went on to testify how someone came to his … aid and, ultimately, the police arrived at the scene…. He said the lighting conditions were – while it was dark out, there was a street light that lit up the area.

The following day, Ruiz selected defendant's photograph from a six-photo array at Plainfield police headquarters. Ruiz viewed the photographs one at a time. He told the administering officer that he was 100% certain of his identification. No one said or did anything

suggestive during the identification process, nor did the officer congratulate him or say anything to him about the person he had selected.

Ruiz's cousin, Patty Garrido, translated for him during the photo-array identification procedure. At the <u>Wade</u> hearing she testified that she translated the instructions for Ruiz as the administering officer read them. Garrido testified that she translated accurately and honestly, and that Ruiz understood the instructions, which Ruiz also confirmed. Garrido, whose first language is Spanish, began high school in the United States in September 2006, and was eighteen years old when the photo array was conducted. She had worked in a sandwich shop, where she translated for her Spanish-speaking co-workers. Garrido testified that Ruiz selected and signed photograph number four because it depicted the man who robbed him, that no suggestive comments or movements were made while the array was conducted, and that Ruiz selected the photo on his own with no help or assistance.

(ECF No. 9-6 at 6-9).

In addition to being the victim of the August 19, 2008 [bicycle] robbery charged in count four, by happenstance Johnson had also witnessed the August 26 robbery of Ruiz charged in counts five through seven.

(*Id.* at 2.)

On September 11, 2008, Johnson also picked defendant's photo from a six-photo array. The lead detective, Hudson, selected the array photos, while Detective Edwin Maldonado administered the array. Maldonado had not been involved in the investigation, and was unaware that defendant was a suspect in the robbery or that his photo was included in the array. Johnson's identification of defendant was video-recorded.

(*Id.* at 13).

The court found the identifications of defendant made by Ruiz and Johnson admissible. However, the court did not permit Johnson to testify about anything that occurred during his August 19 robbery at the trial of the Ruiz robbery.  (*Id.* at 6-17).

4

> On December 7, 2011, Judge Daniel conducted an <u>N.J.R.E.</u> 104(a) hearing on defendant's allegation that Ruiz positively identified him with the hope of receiving favorable treatment from the State, specifically placement in the U-Visa program. Ruiz denied that he was offered any form of favorable treatment in exchange for his testimony, including the possibility of entry into the U-Visa program. The court, employing an <u>N.J.R.E.</u> 403 analysis, determined that Ruiz's immigration status was irrelevant, and that its "limited probative value . . . is far outweighed by [the] unduly prejudicial [e]ffect it may have [on the] jury."

(ECF No. 9-6 at 18).

> Following a December 2011 jury trial, defendant was convicted on counts five through seven…. After merging count six into count five, the court imposed an extended term forty-two-year prison sentence, with an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count five. Defendant received a concurrent eighteen-month prison term on count seven.

(*Id.* at 3).  Judgment was entered on March 29, 2012.  (ECF No. 9-2 at 43-45).  Petitioner appealed, and the New Jersey Superior Court, Appellate Division ("Appellate Division") denied his claims on June 4, 2015.  (ECF No. 9-6 at 1).  On October 26, 2015, the New Jersey Supreme Court denied Petitioner's petition for certification.  (ECF No. 9-9).

On March 10, 2016, Petitioner filed a petition for post-conviction relief ("PCR"), raising seven grounds for relief.  (ECF No. 1 at 6).  The PCR court held oral argument on June 2, 2017 (ECF No. 9-34), and denied PCR relief on June 9, 2017.  (ECF No. 9-35).  Petitioner appealed (ECF No. 9-11), and on August 26, 2019, the Appellate Division affirmed the PCR Court's decision.  (ECF No. 9-14).  The New Jersey Supreme Court denied Petitioner's petition for certification on December 5, 2019.  (ECF No. 9-17).

## III. DISCUSSION

### A. Statute of Limitations

On October 15, 2021, this Court ordered Respondents to file a supplemental answer to Petitioner's second amended petition, to address the issues of exhaustion and timeliness. (ECF No. 18). Respondents submit that the second amended petition was untimely, but equitable tolling may be applicable. (ECF No. 22 at 3-11). For equitable tolling, Respondents cite to *Urcinoli v. Cathel*, 546 F.3d 239 (3d Cir. 2008). (ECF No. 22 at 9). In *Urcinoli*, a district court dismissed a habeas petition without prejudice to permit exhaustion of state court remedies, and despite the petitioner's diligence, the habeas statute of limitations expired by the time he filed a second habeas petition.

The statute of limitations for habeas petitions under 28 U.S.C. § 2254 is found in 28 U.S.C. § 2244(d), which provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Here, the state court criminal judgment became final under § 2254(d)(1)(A), 90 days after the New Jersey Supreme Court denied Petitioner's petition for certification on October 26, 2015, which represents the period for filing a petition for writ of certiorari in the United States Supreme Court. *Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000) (S. Ct. R. 13(1)). Thus, Petitioner's one-year time period to file for habeas relief began to run on January 25, 2016.[3]

A properly-filed petition for post-conviction relief tolls the habeas statute of limitations while the PCR proceeding is pending,

> which includes the period between a lower state court's decision and the filing of a notice of appeal to a higher court, *Carey v. Saffold*, 536 U.S. 214, 221-22 (2002), and through the time in which an appeal could be filed, even if the appeal is never filed.

*Swartz*, 204 F.3d at 420-24. Petitioner's PCR petition was timely filed on March 10, 2016, and the statute of limitations was tolled until December 5, 2019. Petitioner used 45 days of his one-year limitations period between his direct appeal and the date he filed his petition for post-conviction relief. Petitioner then timely filed his original § 2254 habeas petition on January 13, 2020, and his amended petition on January 28, 2020. (ECF Nos. 1, 3). This Court dismissed the amended petition on May 27, 2021, because it contained both exhausted and unexhausted claims. (ECF No.

---

[3] Pursuant to Federal Rule of Civil Procedure 6(a)(1), computing time in days, the day of the event that triggers the period is excluded; intermediate Saturdays, Sundays and legal holidays are included; and the last day of the period is included, unless it lands on a Saturday, Sunday or legal holiday.

12).  Petitioner filed his second amended petition on July 2, 2021.  (ECF No. 13). The second amended petition was untimely because Petitioner's prior filing of a habeas petition under § 2254 did not toll the statute of limitations.  *Duncan v. Walker*, 533 U.S. 167, 181-82 (2001). Respondents submit that Petitioner may be entitled to equitable tolling pursuant to *Urcinoli v. Cathel*, 546 F.3d 269 (3d Cir. 2008).  (ECF No. 9 at 9).

Equitable tolling of the one-year habeas statute of limitations is appropriate only when the petitioner shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland v. Fla.*, 560 U.S. 631, 649 (emphasis deleted in *Holland*) (quoting *Pace v. Diguglielmo* 544 U.S. 408, 418 (2005)).  In *Urcinoli*, a district court dismissed a § 2254 habeas petition without prejudice because it contained both exhausted and unexhausted claims.  *Urcinoli*, 546 F.3d at 270.  On appeal, the Third Circuit stated, "the District Court noted in a footnote that Urcinoli could resubmit those [exhausted] claims after deleting the unexhausted claims from his petition[.]" *Id.* at 273.  Despite the footnote in the district court opinion, "the District Court effectively denied Urcinoli his only viable option" because "[e]ven if he had chosen to forgo exhaustion of all of his claims and had immediately resubmitted a petition with only the three exhausted claims, that second petition would have been untimely because the one-year limitations period had already expired." *Id.*  "[A]t the time Urcinoli's first petition was dismissed in 2003, the 'stay-and-abeyance' procedure approved in *Rhines* had not yet been sanctioned."  *Id.* at 274.  The Third Circuit held that the district court, while legally correct in dismissing the second petition as untimely, had prevented the petitioner from pursuing his habeas claims after exhausting those claims in state court.  *Id.* at 273-74.  "Equitable tolling" was "an appropriate remedy . . .  to ensure Urcinoli" had "the opportunity to have the court evaluate the claims originally presented[.]" *Id.* at 275.  "The District

Court's dismissal, without notice to Urcinoli, prevented him from using the deletion option … to achieve a fair hearing of his properly exhausted claims." *Urcinoli,* 546 F.3d at 275.

Here, although Petitioner timely filed his original habeas petition on January 13, 2020, and his amended petition on January 28, 2020, this did not toll the statute of limitations. *Duncan*, 533 U.S. at 181-82. Petitioner had notice, prior to dismissal of his mixed petition, of his options to obtain habeas review. The notice was provided by Respondents, in their answer to the amended petition, where they argued that the amended petition contained exhausted and unexhausted claims, and they advised Petitioner as follows, citing the Supreme Court in *Rhines v. Weber*, 544 U.S. 269, 275-78 (2005):

> [t]he district court, however, may (1) in limited circumstances, upon good cause shown, stay and hold in abeyance a mixed petition to allow petitioner time to exhaust his state claims; (2) allow petitioner to delete his unexhausted claims; or (3) decide the petition on the merits.

(ECF No. 9 at 33). In his reply brief, rather than choosing one of the three options described in *Rhines*, Petitioner argued that he had raised all of these issues at the state level, but the state courts did not address the issues on the merits. (ECF No. 10 at 14). Thus, he "fulfilled his obligation of putting the issues before the highest state court." (*Id.*)

By Order dated May 27, 2021, this Court explained why some of Petitioner's claims were not exhausted:

> As Petitioner's pro se supplemental appellate brief raised ineffective assistance claims only in a context where their merits would not be considered, that brief did not exhaust any of Petitioner's current ineffective assistance claims. *See Castille [v. Peoples]*, 489 U.S. [346,] 351 [1989]. Likewise, because Petitioner raised only one of his many ineffective assistance claims to all three levels of the state courts during his PCR litigation, he exhausted only that single claim – that counsel failed to cross-examine the victim as to his cross-race identification. Petitioner's remaining ineffective assistance of counsel claims are therefore unexhausted as they were never raised

> to the attention of the New Jersey appellate courts in a context in which their merits would be addressed. *Ragland [v. Barnes*, Civil Action No. 14-7294 (WJM)], 2015 WL 1035428 at *1-3 [D.N.J. Mar. 10, 2015); *see also Castille*, 489 U.S. at 351. As Petitioner's amended petition contains both exhausted and unexhausted claims, this Court is therefore faced with a mixed petition.

(ECF No. 11 at 4, ¶ 6).  This Court further explained that because Petitioner did not dismiss his unexhausted claims and made no attempt to obtain a stay in this matter after it was brought to his attention by Respondents; it had no choice but to dismiss the amended petition without prejudice and without issuing a stay.  (*Id.* at 4-5).  Petitioner did not file a motion for reconsideration.  Therefore, this Court's action of dismissing the amended habeas petition without prejudice did not present an extraordinary circumstance that stood in Petitioner's way from having his claims in his habeas petition heard.  The second amended petition, filed on July 2, 2021, is barred by the statute of limitations.  In an abundance of caution, however, this Court will address the merits of Petitioner's habeas claims.

**B.  Exhaustion of Ground Four**

This Court ordered Respondents to address whether all claims raised in the second amended petition were exhausted, as required by 28 U.S.C. § 2254(a);  *see O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (holding that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.").  In their supplemental answer, Respondents established, by citation to the state court records, that grounds one through three were exhausted, but ground four is unexhausted.  (ECF No. 22 at 11).  Pursuant to 28 U.S.C. § 2254(b)(2), a district court may deny unexhausted claims on the merits. For the reasons discussed below, this Court will deny ground four of the second amended petition on the merits.

**C.  Legal Standard**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).  "[A] determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, dicta in Supreme Court cases "cannot supply a ground for relief."  *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022).  Supreme Court holdings "that speak only at a high level of generality" are also not grounds for habeas relief. *Id.* (citations omitted).  Further, "[s]tate-court decisions are measured against [Supreme Court] precedents as of the time the state court renders its decision and cannot be held unreasonable only in light of later decided cases."  *Id.* (internal quotations and citations omitted)).

"A state court decision involves an unreasonable application of clearly established federal law when no fairminded jurist could reach the state court's conclusion under Supreme Court precedents." *Id.* (internal quotation and alteration omitted)).  "Similarly, if a petitioner alleges the

state court's decision 'was based on an unreasonable determination of the facts' under § 2254(d)(2),
it is not enough to show that 'reasonable minds reviewing the record might disagree about the
finding in question.'"  *Brown*, 142 S. Ct at 1525 (quoting *Brumfield v. Cain*, 576 U.S. 305, 314
(2015) (internal quotation marks and alteration omitted)).

"[E]ven a petitioner who prevails under AEDPA must still today persuade a federal habeas
court that 'law and justice require' relief.'"  *Id.* at 1524 (citing 28 U.S.C. § 2243)).  "[A] federal
court must deny relief to a state habeas petitioner who fails to satisfy either this Court's equitable
precedents or AEDPA. But to grant relief, a court must find that the petitioner has cleared both
tests" including the harmless error analysis described in *Brecht v. Abramson*, 507 U.S. 619, 638
(1993). *Id.* at 1524.

**D.  Analysis**

In his second amended petition, Petitioner raises two claims that were exhausted on direct
appeal, one claim that was exhausted on post-conviction review, and one unexhausted claim.

**1.  Ground One:  "By precluding Defendant from cross-examining Ruiz on his potential bias
due to the U-Visa Program, the Judge committed reversible error, U.S. CONST. AMEND.
VI, XIV; N.J. CONST., ART. I, Para 10."**  (ECF No. 13 at 8).

In support of this claim, Petitioner states that a Rule 104 hearing was held before trial on
the issue of whether Petitioner could question Ruiz-Garrido about his immigration status, and
particularly his awareness of a program that allowed noncitizen violent crime victims to apply for
a special visa, called the U-Visa.  Petitioner complains that Ruiz-Garrido refused to answer any
questions about his immigration status.  He testified that he did not fear the police, but he also
testified that he was not comfortable when a police officer came to his house.  He also testified
that no one ever discussed with him the possibility of obtaining a U-Visa. He planned to return to
Guatemala. The trial court found Ruiz-Garrido credible and held that there was no basis for

defendant to cross-examine him to show bias. Petitioner asserts that the trial court erred by making credibility findings that should have been left to a jury. To establish prejudice, Petitioner asserts that Ruiz-Garrido's testimony was a central issue, and impeaching his credibility had the ability to affect the outcome of the trial.

Respondents oppose relief on this claim because the state courts properly found that such line of questioning was not relevant, and alternatively, that any limited value from this questioning was far outweighed its prejudicial effect. (ECF No. 9 at 5). Respondents also argue that state court evidentiary rulings are not cognizable on habeas review. (*Id.* at 6).

In his reply brief, Petitioner argues that the Sixth Amendment right to confront witnesses encompasses not only situations where the witness has obtained favorable treatment from the prosecution but also where the witness has a subjective expectation of favorable treatment. (ECF No. 10 at 7-9). Petitioner relies on New Jersey state precedents and out-of-district federal precedents. (*Id.*)

In his second amended petition, Petitioner bases this habeas claim on alleged violation of the Sixth and Fourteenth Amendments. Thus, he is challenging more than the state court's evidentiary ruling, and the claim is cognizable on habeas review. Habeas review is of the "'last state-court adjudication on the merits of 'the petitioner's claim.'" *Brown*, 142 S. Ct. at 1528 (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2010)). This claim was denied by the Appellate Division on direct appeal, and the New Jersey Supreme Court denied certification. Therefore, habeas review is of the Appellate Division's decision, which follows.

> On December 7, 2011, Judge Daniel conducted an <u>N.J.R.E.</u> 104(a) hearing on defendant's allegation that Ruiz positively identified him with the hope of receiving favorable treatment from the State, specifically placement in the U-Visa program. Ruiz denied that he was offered any form of favorable treatment in exchange for his testimony, including the possibility of entry into the U-Visa

program. The court, employing an N.J.R.E. 403 analysis, determined that Ruiz's immigration status was irrelevant, and that its "limited probative value . . . is far outweighed by [the] unduly prejudicial [e]ffect it may have [on the] jury."

(ECF 9-6 at 18).

[D]efendant argues that the trial court committed reversible error when it precluded defendant from cross-examining Ruiz as to his immigration status. The defense theory is that Ruiz had a "potential bias based on the hope of favorable treatment . . . particularly in connection with the federal U-visa program, which allows non-citizen victims of violent crimes to apply for a special visa." For his part, during the N.J.R.E. 104(a) hearing to consider the admissibility of this evidence, Ruiz flatly denied defendant's allegations of bias flowing from his immigration status. In the end, the judge concluded that Ruiz's immigration status was irrelevant because it did not tend to prove or disprove a material fact, N.J.R.E. 401, and alternatively that any limited probative value it possessed was "far outweighed" by its prejudicial effect, N.J.R.E. 403.

We review a trial court's evidentiary rulings under an abuse of discretion standard. State v. McGuire, 419 N.J. Super. 88, 135 (App. Div.), certif. denied, 208 N.J. 335 (2011). A trial court's evidentiary rulings will not be disturbed on appeal absent a showing of a clear abuse of discretion, meaning a clear error in judgment. State v. J.A.C., 210 N.J. 281, 295 (2012).

The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the State of New Jersey Constitution guarantee a criminal defendant the right to confront those who testify against him. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; State v. Cabbell, 207 N.J. 311, 328 (2011); State v. Gaikwad, 349 N.J. Super. 62, 86 (App. Div. 2002). The right to cross-examine a witness lies at the heart of the right to confrontation embodied in the Sixth Amendment. Gaikwad, supra, 349 N.J. Super. at 86. Impeaching the credibility of witnesses is one of the primary reasons for cross-examination. Id. at 87 (ECF 9-6 at 22-23).

A defendant's right to confront his accusers, though guaranteed, is not absolute. State v. Harvey, 151 N.J. 117, 188 (1997). The right of confrontation is not a right to "'roam at will under the guise of impeaching credibility.'" Gaikwad, supra, 349 N.J. Super. at 87 (quoting State v. Engel, 249 N.J. Super. 336, 375 (App. Div.), certif. denied, 130 N.J. 393 (1991)). Relevancy and the necessity for a fair

14

resolution of the issues are the key considerations. See State v. Garron, 177 N.J. 147, 171 (2003).

We have previously observed that a witness's immigration status "is very likely to trigger negative sentiments in the minds of some jurors." See Serrano v. Underground Utils. Corp., 407 N.J. Super. 253, 274 (App. Div. 2009). That said, where the probative value of disclosing the immigration status of a witness outweighs the likely prejudice to that witness stemming from such disclosure, a defendant's right to a fair trial by confronting a witness on that issue must prevail.

Here, defendant failed to establish that the limited probative value of cross-examining Ruiz on his immigration status substantially outweighed the likely prejudice that would result from disclosure. Consequently, we reject defendant's argument that the trial judge improperly excluded this line of questioning.

(ECF No. 9-6 at 22-24).

This Court must determine whether the state court's adjudication of this claim was contrary to or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States at the time the state court rendered its decision. The Supreme Court set out the limitations on a defendant's right to confront a witness through cross-examination as follows.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315, 94 S.Ct., at 1110. Indeed, "'[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Id., at 315–316, 94 S.Ct., at 1110 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original). Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, *supra*, at 316–317, 94 S.Ct., at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)). It does

15

> not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original).
>
> In this case, however, the trial court prohibited all inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

*Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). The question of prejudice is whether "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." *Id.* at 680. "[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to … harmless-error analysis." *Id.* at 684.

As an initial matter, Petitioner claims the trial court's finding of Ruiz-Garrido's credibility invaded the province of the jury. (ECF No. 13 at 8). Petitioner is wrong because the trial judge made a preliminary finding, outside the presence of the jury, on the evidentiary value of the witness' testimony and found the jury was not entitled to hear this testimony.

16

Additionally, the state court's adjudication of this claim was not contrary to nor an unreasonable application of the Sixth Amendment Confrontation Clause analysis described by the Supreme Court in *Van Arsdall*. The Supreme Court held that the right to cross-examine for bias is not absolute, and state courts have wide latitude to impose reasonable limits on cross-examination where, among other things, the testimony is prejudicial and/or only marginally relevant. In the state courts, the Appellate Division affirmed the trial court's evidentiary ruling because Petitioner "failed to establish that the limited probative value of cross-examining Ruiz on his immigration status substantially outweighed the likely prejudice that would result from disclosure." (ECF No. 9-6 at 24). Even if reasonable minds could disagree with the weight accorded to relevance and prejudice of the proposed cross-examination, the habeas standard for relief requires a showing that no fairminded jurist would agree with the state court's decision. That standard is not met here.

Moreover, this case is distinguishable from *Van Arsdall*, where the Supreme Court found a violation of the Confrontation Clause where there was no dispute that the state dismissed the witness's pending public drunkenness charge, and the trial court prohibited all cross-examination for impeachment on bias. In contrast here, although the trial court prohibited all cross-examination regarding the witness's immigration status to show bias, there was no evidence the witness had pending charges or immigration proceedings, and Ruiz-Garrido denied receiving any favorable treatment from the prosecution in exchange for his testimony.

Petitioner cites several New Jersey state cases and federal district court cases, which held that the trial courts erred by limiting cross-examination of a prosecution witness in the absence of an explicit promise of leniency on unrelated pending charges. (ECF No. 10). Again, there was no evidence here of any pending charges, only Petitioner's belief that the witness may have entered

17

the United States illegally.  More importantly, on habeas review, courts are limited to applying clearly established federal law as determined by the Supreme Court of the United States, and Petitioner cites no such case.  Petitioner has not met his burden.  Therefore, this Court will deny ground one of the second amended petition.

**2.  Ground Two:  "The use of an unqualified Spanish interpreter and the inclusion of only two other bald men in the array violated Defendant's right to be free from suggestive police identification that create a very substantial likelihood of irreparable misidentification.  U.S. CONST. AMEND. XIV;  N.J. CONST. ART. I. PARA. I."** (ECF No. 13 at 10).

Petitioner challenges the admission of the out-of-court identifications, by witnesses Ruiz-Garrido and Johnson, of Petitioner as the person who robbed Ruiz-Garrido.  (ECF No. 13 at 10-11).  Ruiz-Garrido's cousin served as a Spanish interpreter for him during his identification of a suspect at the police station.  Petitioner submits that Ruiz-Garrido should have been advised that the six photos shown to him might not include the suspect's photo.  Ruiz-Garrido testified in a pre-trial hearing [*Wade* hearing] that he was not given this instruction.  On redirect examination, he clarified that he did not remember whether he was given this instruction.  According to Petitioner, Ruiz-Garrido's failure to remember this instruction supported the defense theory that the English-Spanish translation was faulty, and this caused a likelihood of his misidentification.  Additionally, Petitioner claims the trial court erred in relying on Detective Lucky's testimony about the accuracy of the translation because Detective Lucky did not speak Spanish, so he could not know whether the translation was accurate.  Petitioner asserts that the police did not even attempt to determine Ms. Garrido's qualifications as a translator.

Second, Petitioner submits that, other than his own photo, only two of the other men in the six-person photo array were bald.  Petitioner asserts Ruiz-Garrido testified that what he really noticed about the robber's face was his bald head. Therefore, only three of the six photos in the array could have been the suspect.  Petitioner further cites to the following factors in support of a

18

substantial likelihood of his misidentification as the person who robbed Ruiz-Garrido: (1) Ruiz-Garrido's shirt was pulled over his head during the robbery; (2) the robbery took about a minute; (3) the victim was afraid of being stabbed; (4) the eyewitness was one hundred yards away; and (4) the victim's prior description of the suspect was vague.

Respondents oppose relief concerning the Spanish translation and the alleged suggestive police procedures. (ECF No. 9 at 9-16). They contend the state courts properly found that there was no evidence in the record that anything was translated inaccurately, and that there was nothing impermissibly suggestive about the identification procedures. In reply, Petitioner reiterated his claims. (ECF No. 10).

This Court begins by reviewing the last state court determination on the merits of this claim. The New Jersey Supreme Court denied the petition for certification on direct appeal without addressing the merits. The New Jersey Superior Court, Appellate Division addressed the claim on direct appeal as follows.

> [D]efendant argues that the positive identifications made by both Ruiz and Johnson were the product of unduly suggestive identification procedures and should have been suppressed. We disagree.
>
> A "trial court's findings at the hearing on the admissibility of identification evidence are 'entitled to very considerable weight.' That is, the trial court's findings that photographic identification procedures were reliable should not be disturbed if there is sufficient credible evidence in the record to support the findings." State v. Adams, 194 N.J. 186, 203 (2008) (quoting State v. Farrow, 61 N.J. 434, 451 (1972)); see also State v. Locurto, 157 N.J. 463, 470-71 (1999). Moreover, reviewing courts "should give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses." State v. Johnson, 42 N.J. 146, 161 (1964). In short, an appellate court appreciates that its "reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness he has observed firsthand." State v. Nash, 212 N.J. 518, 540 (2013).

This case was tried before the [New Jersey] Supreme Court's ruling in <u>Henderson</u>, <u>supra</u>, 208 <u>N.J.</u> at 288-93, took effect, wherein the Court revised the State's framework for evaluating eyewitness identification evidence. Because <u>Henderson</u> applies "purely prospectively," we review the identification procedures here using the same two-part <u>Manson</u>/<u>Madison</u> standard employed by the trial court. Under that formulation, a court reviewing the admissibility of an out-of-court identification first ascertains whether the identification procedure was impermissibly suggestive, thereby testing "whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from the suggestive words or conduct of a law enforcement officer." <u>Adams</u>, <u>supra</u>, 194 <u>N.J.</u> at 203 (quoting <u>Farrow</u>, <u>supra</u>, 61 <u>N.J.</u> at 451). If the court finds the procedure impermissibly suggestive, it then decides "whether the impermissibly suggestive procedure was nevertheless reliable by considering the totality of the circumstances and weighing the suggestive nature of the identification against the reliability of the identification." <u>State v. Romero</u>, 191 <u>N.J.</u> 59, 76 (2007) (citation and internal quotation marks omitted).

The factors a court considers in determining reliability include: "the opportunity of the [eye]witness to view the criminal at the time of the crime"; "the [eye]witness's degree of attention"; "the accuracy of [the eyewitness's] prior description of the criminal"; "the level of certainty demonstrated [by the eyewitness] at the confrontation"; and the length of "time between the crime and the confrontation." <u>Adams</u>, <u>supra</u>, 194 <u>N.J.</u> at 204 (quoting <u>Manson</u>, <u>supra</u>, 432 U.S. at 114, 97 S. Ct. at 2253, 53 L. Ed. 2d at 154) (internal quotation marks omitted). A court is to weigh these factors against "the corrupting effect of the suggestive identification itself." <u>Ibid.</u> "If after the evaluation of those factors the court is convinced that, notwithstanding the suggestive nature of the procedure, the witness's identification is reliable, then the identification may be admitted into evidence." <u>Ibid.</u>

Judge Daniel carefully applied those precedents in determining to admit Ruiz's and Johnson's identifications of defendant. After having had the opportunity to see and hear Garrido, the judge found no evidence in the record to support a finding that she failed to translate the photo array procedure accurately. Although only three photos depicting bald men were included in the array, Hudson testified that he was unable to locate any others that fit the suspect's description. Moreover, all of the men shown in the photo array had facial hair in accordance with Ruiz's description of the suspect. Judge Daniel, who had the opportunity to hear the witness descriptions and view the array, found "nothing unduly suggestive

about the photos in and of themselves that were included in this array."

Johnson was previously familiar with defendant, who was "always around" the neighborhood. Additionally, defendant had confronted Johnson during the robbery that took place one week earlier. Then, on August 26, Johnson got a "good look" at defendant's face during his robbery of Ruiz, and was certain as to his identification. Even if Maldonado uttered the word "good" after Johnson's identification of defendant during the photo array, Maldonado was not involved in the investigation and was unaware that defendant was a suspect. Having heard the testimony and viewed the video of the identification procedure, Judge Daniel concluded that the comment was not so impermissibly suggestive as to impugn the reliability of the procedure, which was otherwise conducted in accordance with the Attorney General Guidelines. Those findings are "entitled to very considerable weight," Farrow, supra, 61 N.J. at 451, and on this record we find no basis to disturb them.

(ECF No. 9-6 at 18-22).

The state court correctly identified *Manson v. Brathwaite*, 432 U.S. 98 (1997) as clearly established federal law by the Supreme Court on the admissibility of out-of-court witness identifications.  In *Manson*, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment does not compel exclusion "in a state criminal trial, apart from any consideration of reliability, of pretrial identification evidence obtained by a police procedure that was both suggestive and unnecessary."  *Id.* at 99.  Once there has been a finding of an unnecessarily suggestive police identification procedure, 'reliability is the linchpin in determining the admissibility of identification testimony"  *Id.* at 114.  "[T]he corrupting effect of the suggestive identification" is to be weighed against the factors of "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Id.*

Petitioner challenges the reasonableness of the state court's application of *Manson*. The suggestive identification procedures he identifies are the use of an unqualified interpreter for translation and including only three persons who were bald in the six-photo array. The Appellate Division affirmed the trial court's finding that neither the Spanish translation nor the photos in the array were impermissibly suggestive, but the court nevertheless considered the reliability of the identifications by Ruiz-Garrido and Johnson, and found their identifications of Petitioner reliable based on the appropriate factors.

State courts' findings are presumed correct on habeas review, absent clear and convincing evidence to the contrary. Petitioner's claim that there was a faulty Spanish translation is based on the fact that the translator read the written photo array instructions to him, which included an instruction that the suspect's photo might not be contained in the photo array, but Ruiz-Garrido testified that he did not remember this instruction. (ECF No. 9-18). This is not clear and convincing evidence that rebuts the presumption of correctness attached to the state courts' finding that Garrido provided accurate translation during the identification procedure.

The Appellate Division also found, as Petitioner claims, that only three of six photos in the photo array depicted bald men. The Appellate Division, however, found the identifications were reliable because the trial court's reliability findings were made after having the opportunity to hear the witness descriptions of the suspect and view the array. The Appellate Division cited to Ruiz-Garrido's testimony at the *Wade* hearings that (1) he was approximately one-and-a-half feet from Petitioner during their encounter; (2) he could see Petitioner's face clearly without obstruction; (3) he was not under the influence of drugs or alcohol; (4) he identified the suspect to police as a tall black man, a bit taller than himself, who had facial hair and a bald head; (5) although it was dark, a street light lit up the area; (6) he made the identification the next day; and (7) he told police he

was 100% certain about his identification.  The Appellate Division's finding that Ruiz-Garrido's identification procedure was reliable and admissible into evidence involved a reasonable application of *Manson*.

Regarding Johnson's identification of Petitioner, the *Wade* hearing revealed that Johnson was familiar with defendant due to his regular presence in the neighborhood, his confrontation with Petitioner one week earlier when Petitioner took his bicycle, and that Johnson had a "good look" at Petitioner's face during his robbery of Ruiz-Garrido, and he testified that he was certain about his identification.  (ECF No. 9-20 at 4-47; 9-21 at 2-18). In light of these factors, the Appellate Division reasonably applied the *Manson* test in finding the identifications were reliable and admissible. Therefore, this Court denies ground two of the amended petition.

**3.  Ground Three:  "Petitioner received ineffective assistance of counsel [] when trial counsel failed to question the victim during trial as to his ability to make a cross racial identification."** (ECF No. 13 at 12.)

Petitioner contends that his trial counsel was ineffective by failing to question a Hispanic victim about his ability to identify a black suspect.  Respondents oppose relief because the jury was given an instruction on cross-racial identification, and Petitioner could not establish prejudice because the Appellate Division upheld the identification procedure on direct appeal.  Respondents note that the jury was instructed as follows:

> Cross racial affects. The fact that an identifying witness is not of the same race as the perpetrator and/or defendant and whether that fact might have had an impact on the accuracy of the witnesses original perception and/or the accuracy of the subsequent identification, you should consider that an ordinary human experience people have greater difficulty in accurately identifying members of a different race.

(ECF No. 9 at 20, citing 12T79-1 to 9).  Additionally, Ruiz-Garrido was 100% certain of his identification, which was found reliable by the trial court and Appellate Division.  (*Id.*, citing

18T18-24 to 19-12).  Finally, Petitioner was also identified by Johnson, who was of the same race as Petitioner.  (ECF No. 9 at 21).

The New Jersey Supreme Court denied certification on PCR appeal and did not address the merits of the claim.  The Appellate Division affirmed the PCR Court "substantially for the reasons expressed by Judge William A. Daniel in his decision denying defendant's PCR petition."  (ECF No. 9-14 at 5).  The PCR Court identified and described the two-part *Strickland* test, the clearly established Federal law by the Supreme Court governing Sixth Amendment ineffective assistance of counsel claims.  (ECF No. 9-14 at 4).  Under *Strickland v. Washington*, a petitioner must establish two elements to state a claim of ineffective assistance of counsel in violation of the Sixth Amendment:  (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 687, 694 (1984).  Significantly, if a petitioner fails to show prejudice, the claim fails without having to address whether counsel's performance was constitutionally deficient.  *Id.* at 697.

The PCR Court found that no prejudice resulted from defense counsel's failure to question the victim's ability to make a cross-racial identification because on direct appeal the Appellate Division affirmed the trial court's finding that the identifications were reliable based on the trial court's lengthy *Wade* hearing and application of strict identification standards.  (ECF No. 9-35 at 10).  Additionally, the PCR court noted that not only did the Hispanic victim identify Petitioner, who is black, an eyewitness to the robbery, who is black, also identified Petitioner.  (*Id.*)  Petitioner has not provided any reason why the jury would have found him not guilty if counsel had questioned Ruiz-Garrido about his ability to make a cross-racial identification, particularly given Ruiz-Garrido's testimony that he was 100% certain of the identification. The Appellate Division's

24

determination that Petitioner was not prejudiced by his counsel's failure to question the victim about his ability to make a cross-racial identification is based on a reasonable application of the *Strickland* standard.

**4.  GROUND FOUR:  "Petitioner [received] ineffective assistance of counsel because counsel failed to secure the appearance of his witness. The witness, Patty Garrido had provided no address or place of employment. The only means of contact provided by the police was a telephone number. Counsel should have served Ms. Gerrido [sic] with a subpoena when she voluntarily [appeared] to testify at the pre-trial hearing.** (ECF No. 13 at 13).

Ground Four is unexhausted because Petitioner did not raise the claim in his appeal of the PCR court's decision. (ECF Nos. 11, 12).  Nevertheless, this Court will address the merits of the claim and deny relief, as permitted under § 2254(b)(2).  In support of this claim, Petitioner asserts Ms. Garrido testified at the pre-trial hearing that the victim never told her that he had been robbed. (ECF No. 13 at 13).  Petitioner claims he was unable to challenge the recall and credibility of the victim's testimony without cross-examining Ms. Garrido about her statement.  (*Id.*)

The *Strickland* test applies to this ineffective assistance of counsel claim, and Petitioner fails to state a claim.  As the PCR Court noted, Ms. Garrido, the victim's cousin, was not a witness to the robbery, her only role was to translate for the victim during the photo identification process. (ECF No. 9-35 at 9).  The fact that the victim did not tell his cousin about the robbery before the identification does not call into question the credibility of the victim's testimony.  Moreover, Petitioner had the opportunity to challenge the victim's credibility by cross-examining the victim at trial.  (ECF No. 9-24 at 75-125, 127-29).  Therefore, Petitioner has not established prejudice, and this Court denies ground four of the second amended habeas petition.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has

"made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's habeas claims are all without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V.  CONCLUSION

For the reasons stated above, this Court will deny Petitioner's second amended petition for a writ of habeas corpus under § 2255 (ECF No. 13), a deny a certificate of appealability.


An appropriate order follows.


Date:_____September 26__, 2022

Hon. Susan D. Wigenton
United States District Judge